Melvin PARKS and Louise
Parks, Plaintiffs,

v.

UNION CARBIDE CORPORATION, Defendant-Third-Party-Plaintiff-Appellant,

v.

CHEMLIME CORPORATION,
Third-Party-Defendant-Respondent.

No. 61468.

Supreme Court of Missouri,
En Banc.

June 10, 1980.

Rehearing Denied July 15, 1980.

Kemper R. Coffelt, Roberts, Heneghan & Coffelt, Inc., St. Louis, for Union Carbide Corp.

Eugene K. Buckley, Gerre S. Langton, Evans & Dixon, St. Louis, for Chemlime Corp.

PER CURIAM.

This appeal presents a question of contractual, as opposed to non-contractual, indemnity.

Plaintiffs sued Union Carbide Corporation for damages for injuries sustained by Melvin Parks while performing work for his employer, Chemlime Corporation, a transporter of lime, on Carbide's premises. Parks charged that while he was on his truck parked adjacent to Carbide's storage tanks and sewer lines, Carbide negligently injected water into a sewer line so that water pressure entered a storage tank and caused hot water and lime to erupt from the storage tank and drop on him. Carbide denied negligence and filed a third-party petition against Chemlime alleging a right to be indemnified by Chemlime for all sums awarded plaintiffs under an agreement in which Chemlime agreed to warn and supervise its employees in operations on Carbide's premises. Chemlime obtained judgment on the pleadings by an order made final for purposes of appeal.[1]

The court of appeals said it was constrained by *McDonnell Air. Corp. v. Hartman-Hanks-Walsh P. Co.*, 323 S.W.2d 788 (Mo.1959) to hold that the third-party petition should be permitted, but transferred the case because it was not certain as to the interpretation of *McDonnell Air. Corp. v. Hartman-Hanks-Walsh P. Co., supra*, in light of *Missouri Pac. R. Co. v. Whitehead & Kales Co.*, 566 S.W.2d 466 (Mo. banc 1978). The dispositive question is whether the

---

1. Appellant's brief in this Court advises that the *Parks v. Union Carbide* suit proceeded to trial and was settled during trial.

agreement between Union Carbide Corporation and Chemlime Corporation contains clear and unequivocal terms of an intent of Chemlime to indemnify Union Carbide for liability for personal injuries to plaintiffs caused by Union Carbide's negligence. This Court holds that it does not, and affirms the judgment in denial of the third-party petition.

At the time of its transfer of this appeal, the court of appeals did not know how this Court would rule the question whether § 287.120.1, RSMo 1978, of the Workmen's Compensation Law would operate to release an employer subject to the law from other tort liability in light of *Missouri Pac. R. Co. v. Whitehead & Kales Co., supra. State ex rel., etc. v. Ferriss,* 588 S.W.2d 489 (Mo. banc 1979), subsequently held that because the question was answered by the statute the court "need not examine the breadth and scope of *Whitehead and Kales* ". As to *McDonnell Air. Corp. v. Hartman-Hanks-Walsh P. Co., supra,* the court said that there "the Court allowed the non-employer defendant to maintain an indemnity action against the employer of the injured employee but only on the basis that the employer defendant (Hartman) had breached a duty it expressly agreed (contracted) to perform with the non-employer (McDonnell). The rationale of the *McDonnell Air. Corp.* case, *supra,* supports the conclusion that, aside from the exception noted therein, the employer is not liable to the non-employer defendant for any sums that non-employer party is liable for to the injured plaintiff-employee in tort." 588 S.W.2d at 490.

*Missouri Pac. R. Co. v. Whitehead & Kales Co., supra,* dealt with non-contractual indemnity and relative fault: "A principled right to indemnity should rest on relative responsibility and should be determined by the facts as applied to that issue. * * * The two concurrent tortfeasors should be treated according to their respective fault or responsibility." [2] 566 S.W.2d at 472. It

did not change the right of a plaintiff to settle with one or more joint tortfeasors as provided in § 537.060, RSMo 1978, the liability of a workmen's compensation employer as provided in § 287.120.1, RSMo 1968, or the employer's right of subrogation as provided in § 287.150, RSMo 1978. It did not impair the right of contract with respect to any such matters. It expressly excluded any application to "indemnity which comes about by reason of contracts . . . ." *Id.* at 468, n. 2.

Carbide asserts that it is not "pursuing any theory of indemnity sounding in tort"; that its third-party petition "is based upon a contractual indemnity theory."

Neither *McDonnell Air. Corp. v. Hartman-Hanks-Walsh P. Co., supra,* nor *Missouri Pac. R. Co. v. Whitehead & Kales Co., supra,* touches the problem of what language is necessary in a contract to permit the would-be indemnitee (Union Carbide) to be indemnified against its own negligence, a situation differing from the usual case where the would-be indemnitee seeks to be indemnified for damages sustained by it from the indemnitor's negligence.

Union Carbide relies upon the following from its agreement with Chemlime:

"9. THE CO–PRODUCT LIME WILL BE SOLD TO YOU 'AS IS'. NO WARRANTIES BY US (OTHER THAN WARRANTY OF TITLE AS PROVIDED IN THE UNIFORM COMMERCIAL CODE) WILL BE IMPLIED OR OTHERWISE CREATED UNDER THE UNIFORM COMMERCIAL CODE, INCLUDING BUT NOT LIMITED TO WARRANTY OF MERCHANTABILITY AND WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE. You acknowledged that you may obtain procedures which have the capability of analyzing the co-product lime. No claim of any kind with respect to the co-product lime, whether or not based on negligence,

---

2. " * * * the ability of a plaintiff to sue and ultimately collect judgment against his or her choice of tortfeasor need not be impaired. Plaintiff continues free to sue one or more concurrent tortfeasors as he sees fit and noth-

ing that transpires between them as to their relative responsibility can reduce or take away from plaintiff any part of his judgment." 566 S.W.2d at 474.

shall be greater than the price of the co-product lime in respect to which such claim is made.

"10. You acknowledge that there are precautions which should be followed in the handling and use of the co-product lime. You agree that your personnel associated with the co-product lime are aware of the precautions and assume all responsibility for the warning of your employees, independent contractors and customers in this respect. You agree to have your personnel use due care in all matters relating to any persons or property on our premises. You assume responsibility for the results of use or resale of the co-product lime.

"11. You will be responsible for inspecting your operations at our plants to ascertain that they comply with proper safety and environmental practices and the requirements of this Agreement. However, we reserve the right, should we consider it appropriate at any time, to inspect your operations at our plants to ascertain for ourselves whether you are conducting your operations in accord with proper safety and environmental practices and the requirements of this Agreement. If we believe that you are not conducting your operations at any of our plants in accord with proper safety and environmental practices or the requirements of this Agreement, and we notify you in writing of said practices at such plant specifying a reasonable time within which such practices are to be corrected, and such practices are not corrected within the time specified, then by giving you written notice we may forthwith terminate your right to purchase and pick-up co-product lime at such plant."

*Kansas City Power & Light Co. v. Federal Construction Corp.*, 351 S.W.2d 741 (Mo. 1961), held that in a commercial setting, "where parties stand on a substantially equal footing, one may legally agree to indemnify the other against the results of the indemnitee's own negligence." 351 S.W.2d at 745. The court also stated that "a contract of indemnity will not be construed so as to indemnify one against loss or damage resulting from his own negligent acts unless such intention is expressed in clear and unequivocal terms." *Id.* The rationale for this rule was stated, *Missouri District Telegraph Co. v. Southwestern Bell Telephone Co.*, 338 Mo. 692, 93 S.W.2d 19, 28 (1935):

"'Contracts of indemnity . . . are usually intended to provide against loss or liability of one party, through the operations of the other, or caused by physical conditions that are under the control of the other—over which the party indemnified has no control. Indeed, it would take clear language to show that a contract of indemnity was intended to cover conditions or operations under the control of the party indemnified . . such, for instance, as accidents, the proximate cause of which is the negligence of the party indemnified.'"

(quoting *North American Ry. Construction Co. v. Cincinnati Traction Co.*, 172 F. 214, 216 (7th Cir. 1909)). "[I]n the absence of such clear expression or where any doubt exists as to the intention of the parties," courts in Missouri will not construe a contract of indemnity to indemnify against the indemnitee's own negligence. *Southwestern Bell Telephone Co. v. J.A. Tobin Construction Co.*, 536 S.W.2d 881, 885 (Mo.App. 1976).

No such clear and unequivocal terms expressed an intent by Chemlime to indemnify Carbide for its own acts of negligence. Carbide contends that the last line in paragraph No. 10 of its agreement with Chemlime, presents sufficient evidence of such intent: "You assume responsibility for the results of use or resale of the co-product lime." This provision does not mention personal injuries caused by Carbide's own negligence, and such broad and general terms will not be construed to indemnify Carbide for its own acts of negligence.

Carbide contends in the alternative that Chemlime's agreement to warn and supervise its employees in their employment activities on Carbide's premises in paragraph Nos. 10–11 is sufficient to imply a promise

to indemnify Carbide for liability to employee Parks. This contention fails for the same reason that Carbide's reliance on paragraph No. 10 of the agreement to establish an express promise to indemnify fell short. The basis of Parks' claim was Carbide's alleged negligence in causing an eruption in a storage tank. Just as paragraph No. 10 did not contain the requisite clear and unequivocal terms demonstrating an intention to indemnify liabilities due to the indemnitee's own negligence, Chemlime's agreement to warn and supervise its employees did not contain or imply such clear and unequivocal terms.

Accordingly, the trial court did not err in sustaining Chemlime's motion for judgment on the pleadings on Carbide's third-party petition, because there is no indication of clear and unequivocal terms expressing Chemlime's intent to indemnify Carbide for liability for personal injuries caused by Carbide's negligence.

The judgment of the trial court is affirmed.

WELLIVER, J., withdraws dissenting opinion and refiles modified dissenting opinion.

SEILER, J., dissents and concurs in dissenting opinion of WELLIVER, J.

DONNELLY, J., withdraws his concurrence in dissenting opinion of WELLIVER, J., and dissents in separate dissenting opinion filed.

RENDLEN, J., withdraws his vote to concur in result and concurs in the majority opinion.

HIGGINS and MORGAN, JJ., and BARDGETT, C.J., concur in the majority opinion.

WELLIVER, Judge, dissenting.

I respectfully dissent.

The principal opinion would set in concrete two exceptions to the rule announced in *Missouri Pacific Railroad Co. v. Whitehead and Kales Co.*, 566 S.W.2d 466 (Mo. banc 1978), that two concurrent tortfeasors should bear the damages caused to the plaintiff in proportion to their relative fault. The principal opinion approves the exception to *Whitehead and Kales* that was created in *State ex rel. Maryland Heights Concrete Contractors, Inc. v. Ferriss*, 588 S.W.2d 489 (Mo. banc 1979). The opinion then would add still another exception by excluding from the comparison process contractual liability for tort as it was defined in *McDonnell Aircraft Corp. v. Hartman-Hanks-Walsh Painting Co.*, 323 S.W.2d 788 (Mo.1959).

In *Steinman v. Strobel*, 589 S.W.2d 293, 294–95 (Mo. banc 1979) (Welliver, J., concurring), when it appeared that we could not agree on a form of comparative negligence, thereby going all the way with the general concept of *Whitehead and Kales*, I suggested that we return to pre-*Whitehead and Kales* doctrines as an alternative preferable to the present confusion and resulting tie-up of litigation. Finding no takers for my suggestion, I would now acknowledge the obligation of the court to move in the direction of making *Whitehead and Kales* both understandable and workable.

If there is to be no retreat from the doctrine of relative fault and the equitable principles on which it is based, then we must move to extend those principles in order to achieve consistency in our law of tort liability. *Whitehead and Kales* wrought far-reaching changes in our system of compensating the victims of tortious injury. Yet, two years after *Whitehead and Kales* was decided, the basis, extent and consequences of the doctrine of relative fault remain shrouded in mystery, confusion and uncertainty. Most other states that have adopted relative fault among defendants have taken this step only after adopting a system of comparative negligence. *American Motorcycle Association v. Superior Court of Los Angeles County*, 20 Cal.3d 578, 146 Cal.Rptr. 182, 195, 578 P.2d 899, 912 (1978); *Packard v. Whitten*, 274 A.2d 169 (Me.1971); *Bartels v. City of Williston*, 276 N.W.2d 113 (N.D.1979); *Bielski v. Schulze*, 16 Wis.2d 1, 114 N.W.2d 105 (1962). *Cf. Dole v. Dow Chemical Co.*, 30 N.Y.2d

143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972). We injected the limited relative fault of *Whitehead and Kales* into our system of contributory negligence and then started on a course of qualifying it into non-existence. It is time for the Court to reexamine that decision and attempt to direct our bench and bar toward a workable system of relative fault. The doctrine of relative fault is responsive to current concepts of fairness and equity, and to the needs of contemporary society. The doctrine has the quality and the potential to grow and it does not deserve to be qualified into non-existence.

The principal opinion begins with the statement that this case involves contractual indemnity and not non-contractual indemnity. In fact, it involves both. Appellant's third-party petition pleaded in the alternative, alleging both contractual indemnity and tort indemnity theories:

> [I]f plaintiffs recover judgment against [appellants] on plaintiffs' purported cause of action, such judgment will be the result of the primary and active negligence of the third-party defendant and breach of the contractual agreements between third-party plaintiff Union Carbide Corporation and third-party defendant and the negligence of defendants and third-party plaintiffs, if any, will be secondary and passive so as to entitle defendants and third-party plaintiffs to judgment over and against third-party defendant for the full amount of any judgment which plaintiffs may recover against defendants and third-party plaintiffs.

Appellant thus alleged that appellant's negligence was secondary and passive whereas respondent's negligence was primary and active. Under *Whitehead and Kales*, the third-party petition in effect alleges that appellant's fault was relatively less than respondent's. 566 S.W.2d at 468. In the brief that appellant filed in the court of appeals, appellant still pursued that aspect of its claim for indemnity that was based on respondent's "tortious conduct." It is true that appellant stated in its brief filed in this Court that it "is not pursuing any theory of indemnity sounding in tort," but this choice was apparently made because of appellant's conclusion that *Maryland Heights* "removes any consideration of tort based indemnity from this Appeal."

In *Maryland Heights*, the Court stated that it "need not examine the breadth and scope of *Whitehead and Kales*," because the question whether the employer can be made a party for the purpose of comparing his relative fault in causing an employee's injury is answered by the provision releasing an employer subject to the workmen's compensation chapter from all other liability. 588 S.W.2d at 490. The refusal to examine the breadth and scope of *Whitehead and Kales* in *Maryland Heights* resulted in the drastic limitation of the breadth and scope of the doctrine of relative fault without appropriate examination. I am persuaded by the opinion of my brother, Donnelly, J., that the statutory release provision answers the distinct question whether a judgment can be entered against the employer, and leaves open the question whether the employer can be made a party for the purpose of comparing his relative fault in the causation of an employee's injury. 588 S.W.2d at 492 (Donnelly, J., dissenting). I believe that both of appellant's claims for indemnity—both non-contractual and contractual—require examination of the scope and breadth of the doctrine of relative fault.

## I. THE BREADTH AND SCOPE OF RELATIVE FAULT

### A. The Principle of Fairness in *Whitehead and Kales*

Determining whether Union Carbide (appellant) may secure noncontractual indemnity from Chemlime (respondent) on account of injuries sustained by Chemlime's employee Parks requires examination of the breadth and scope of *Whitehead and Kales* and a reexamination of *Maryland Heights*. Throughout the opinion in *Whitehead and Kales*, reliance is placed on what is called the "principle of fairness." For example:

> The long history of the law of joint and concurrent tortfeasor liability in our jurisprudence is in fact a rich expositional

refinement of the *principle of fairness*. [566 S.W.2d at 468–69; emphasis added.]

.    .    .    .    .

Indemnity is theoretically tied to the *principle of fairness*. [*Id.* at 469; emphasis added.]

.    .    .    .    .

Using the analogy of an old time-worn building, we have added and re-constructed so much of our law of joint and concurrent tortfeasor liability, the origins of which are ancient, that it has lost its architectural integrity and its structural balance. Only the foundation—the *principle of fairness*—remains undisturbed and sturdy. We have therefore determined that, steadfastly consistent with the dictates of our common law tradition and the principles of equity embedded therein, we are obligated to reconstruct upon the *principle of fairness* a law of joint and concurrent tortfeasor liability which is secure, predictable, and effective. [*Id.* at 472; emphasis added.]

.    .    .    .    .

The *principle of fairness* imbedded within our law compels this adoption of a system for the distribution of joint tort liability on the basis of relative fault. [*Id.* at 474; emphasis added.]

.    .    .    .    .

The interests of plaintiffs are secure; the interests of joint or concurrent tort-feasors will now be clothed in a rule based upon realism and *fairness* between them. [*Id.* at 474–75; emphasis added.]

The principles of equity and fairness on which the adoption of relative fault in *Whitehead and Kales* is based are very broad principles. The doctrine of relative fault must be equally broad in scope. In order to determine the breadth of the equitable principles underlying the adoption of relative fault, those principles must be given some content.

The "principle of fairness" is stated in *Whitehead and Kales* as follows: "[I]n exchange for the opportunity of some undertaking, we each promise all others that we will be liable for the damage which our own negligence in the undertaking has caused." 566 S.W.2d at 469 n. 4.[1] The Court stated that it is this principle which is the basis of or the premise for our fault-based system of tort liability. The equitable principle which prompted the adoption of the system of relative fault is simply that one is liable for the damage which he has negligently caused.

### B. The Central Equitable Principle as Stated in Cases from Other Jurisdictions

Several cases from other jurisdictions which adopt a relative fault system of distributing joint tort liability are cited in

---

1. This statement of the principle of fairness is followed by a citation to J. Rawls, A Theory of Justice 348 (1971). The cited page falls within a section of the treatise entitled "The Arguments for the Principle of Fairness." The statement of the principle of fairness is found in Rawls' treatise at pp. 111–12, and reflects the view that the principle of fairness is given content by the "rules of an institution":

> [A] person is required to do his part as defined by the rules of an institution when two conditions are met: first, the institution is just (or fair), that is [in accordance with two principles of justice for which Rawls argues] . . . ., and second, one has voluntarily accepted the benefits of the arrangement or taken advantage of the opportunities it offers to further one's interests.

Rawls attempts to use this principle to account for all individual obligations other than moral duties. He presents as one of the arguments for the principle of fairness the view that agreement to that principle is a condition of the existence of our "practice of promising." Rawls does not formulate his "principle of fairness" in terms of a promise running from each of us to all others. Obviously such a formulation would render the above argument for the principle of fairness circular—the individual obligation to fulfill promises in general cannot be fruitfully explained in terms of a promise. Of course, we have no need to derive all of our common law tort obligations from a contract model. We must get on with the task of defining what it means to "do one's part" within our relative fault system of tort liability. Completion of this task will require further refinement of the underlying principle of fairness.

*Whitehead and Kales*, 566 S.W.2d 474 n. 7.[2] These cases state the central equitable principle in a variety of ways. In *Packard v. Whitten*, 274 A.2d 169 (Me.1971), the court stated:

> [The] right of contribution among unintentional joint tort-feasors is an equitable right founded upon acknowledged principles of natural justice. [*Id.* at 179.]

> . . . . .

> The doctrine of contribution is a judicial concept predicated upon the equitable principle that one of two or more tort-feasors should not in fairness be required to undertake the entire burden of indemnifying the injured party. [*Id.* at 180.]

> . . . . .

> We see no reason why in logic or in justice the law should expect that the joint tort-feasor should ultimately be required to contribute more—or less—than a share of the total damages proportionate to his causal fault. [*Id.*]

The court in *Dole v. Dow Chemical Co.*, 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972), speaks of the courts' "struggle toward fairness" and undertakes to "re-examine the basic fairness" of the system of indemnity:

> The conclusion reached is that where a third party is found to have been responsible for a part, but not all, of the negligence for which a defendant is cast in damages, the responsibility for that part is recoverable by the prime defendant against the third party.

30 N.Y.2d at 148–149, 331 N.Y.S.2d at 387, 282 N.E.2d at 292.

In *Kelly v. Long Island Lighting Co.*, 31 N.Y.2d 25, 334 N.Y.S.2d 851, 286 N.E.2d 241 (1972), the court states that the "new rule of apportionment [adopted in *Dole* is] . . . pragmatically sound, as well as realistically fair." 31 N.Y.2d at 29, 334 N.Y.S.2d at 854, 286 N.E.2d at 243. "The fairer rule, we believe, is to distribute the loss in proportion to the allocable concurring fault." *Id.*

In *Best v. Yerkes*, 247 Iowa 800, 77 N.W.2d 23 (1956), the rule against contribution among joint tortfeasors is traced to its origin in *Merryweather v. Nixan*, 8 Term. Rep. 186, 101 Eng.Rep. 1337 (K.B.1799), as founded on the policy that "the intentional wrongdoer is not entitled . . . to the aid of the law in adjusting any claims against his confederate . . . in causing a deliberate and planned injury to a third party." 247 Iowa at 807, 77 N.W.2d at 28. Thus, the court held that where there is "no claim or showing of an intentional wrong, or of moral turpitude or any concerted action by the alleged tortfeasors . . . there is at least a right of equitable contribution between them." 247 Iowa at 810, 77 N.W.2d at 29.

In *Bielski v. Schulze*, 16 Wis.2d 1, 114 N.W.2d 105 (1962), the Supreme Court of Wisconsin held that "the amount of liability for contribution of tortfeasors who sustain a common liability by reason of causal negligence should be determined in proportion to the percentage of causal negligence attributable to each." 16 Wis.2d at 6, 114 N.W.2d at 107. The court noted:

> In discussing the right of contribution and its effect, we have often used such

2. The 1939 version of the Uniform Contribution Among Joint Tortfeasors Act, 12 U.L.A. 57–59 (1975), provided in optional subsection 2(4) for considering the relative degrees of fault of joint tortfeasors in determining their respective shares of liability. 12 U.L.A. at 57. Subsection 2(4) of the 1939 U.C.A.J.T.A. is in effect in four states: Arkansas, Delaware, Hawaii and South Dakota. Ark.Stat.Ann. § 34–1002(4) (1962); Del.Code Ann. tit. 10 § 6302(d) (1975); Hawaii Rev.Stat. § 663–12 (1976); S.D.Compiled Laws Ann. § 15–8–15 (1967). *See Wheaton Van Lines, Inc. v. Williams*, 240 Ark. 280, 399 S.W.2d 258, 261–62 (1966); *Fehlhaber v. Indian Trails, Inc.*, 45 F.R.D. 285, 287 (D.Del.1968); *Mitchell v. Branch*, 45 Hawaii 128, 363 P.2d 969, 978 (1961); *Degan v. Bayman*, 86 S.D. 598, 200 N.W.2d 134, 136 n. 2 (1972). *See generally* Annot., Contribution or Indemnity Between Joint Tortfeasors on Basis of Relative Fault, 53 A.L.R.3d 184, 198–201 (1973). Several other states now have statutory provisions for contribution on the basis of relative fault. Idaho Code § 6–803(3) (1979); N.J.Stat.Ann. § 2A:15–5.3 (West Supp.1979); N.D.Cent.Code § 9–10–07 (1975); Or.Rev.Stat. § 18.445 (1977); 42 Pa.Cons.Stat.Ann. § 7102(b) (Purdon 1979); Tex.Rev.Civ.Stat.Ann. art. 2212a, § 2(b) (Vernon Supp.1979); Utah Code Ann. § 78–27–40(2) (1977); Wyo.Stat. § 1–1–111(a)(i) (1977).

terms as his "fair and equitable share," "equity and natural justice," "more than his proportion," "more than his just share," and "more than his proportionate share."

If the doctrine is to do equity, there is no reason in logic or in natural justice why the shares of common liability of joint tortfeasors should not be translated into the percentage of the causal negligence which contributed to the injury. This is merely a refinement of the equitable principle.

16 Wis.2d at 9, 114 N.W.2d at 109 (footnotes omitted). The court observed that "No one denies the proposed change is more just in distributing the loss in proportion to the degree of negligence or fault which caused it." 16 Wis.2d at 10, 114 N.W.2d at 109. The court also observed that it was "stressing the basic goal of the law of negligence, the equitable distribution of the loss in relation to the respective contribution of the faults causing it." 16 Wis.2d at 17, 114 N.W.2d at 113.

Finally, in *Tolbert v. Gerber Industries, Inc.*, 255 N.W.2d 362 (Minn.1977), the Supreme Court of Minnesota adopted the rule that: "Tortfeasors must now accept responsibility for damages commensurate with their own relative culpability." 255 N.W.2d at 367. "By limiting the reallocation of loss between joint tortfeasors to contribution based upon relative fault, the more culpable tortfeasor will continue to bear a greater share of the loss, but at the same time his joint tortfeasor will not continue to escape all liability as in the past." *Id.* The court states that indemnity in cases where the one seeking indemnity has only derivative or vicarious liability for damages caused by the one sought to be charged is justified by "the fundamental principle that one who is guilty of injurious misconduct is himself liable therefor." *Id.* at 366.

The supreme courts of two other states have recently adopted a rule of contribution among joint tortfeasors based upon relative degrees of fault. *Skinner v. Reed-Prentice Division Package Machinery Co.*, 70 Ill.2d 1, 15 Ill.Dec. 829, 834, 374 N.E.2d 437, 442,

cert. denied, 436 U.S. 946, 98 S.Ct. 2849, 56 L.Ed.2d 787 (1977); *Royal Indemnity Co. v. Aetna Casualty and Surety Co.*, 193 Neb. 752, 229 N.W.2d 183, 190 (1975). The opinions in both cases quote the following statement from W. Prosser, Law of Torts § 50, p. 307 (4th ed. 1971):

There is obvious lack of sense and justice in a rule which permits the entire burden of a loss, for which two defendants were equally, unintentionally responsible, to be shouldered onto one alone, according to the accident of a successful levy of execution, the existence of liability insurance, the plaintiff's whim or spite, or his collusion with the other wrongdoer, while the latter goes scot free.

*Skinner*, 70 Ill.2d at 13, 15 Ill.Dec. at 834, 374 N.E.2d at 442; *Royal Indemnity*, 193 Neb. at 763, 229 N.W.2d at 189.

Whether called logic, or natural justice, or equity, or fairness, or proportion, the principle which lies at the very center of our system of tort liability is the principle that one is liable for the damage which he wrongfully causes. The converse of this principle, that one is not liable for damage which he did not wrongfully cause, is the true basis of our relative fault system and our rules governing contribution and indemnity.

C. Application of the Principle of Fairness

To state the principle that one is not liable for the damage which he did not wrongfully cause is merely to begin the analysis. *Whitehead and Kales* applied this principle to discard a number of doctrines that were long a part of Missouri law. Among the doctrines discussed in *Whitehead and Kales* are the following:

(1) Prior to *Whitehead and Kales*, one joint or concurrent tortfeasor was not entitled to indemnity from other joint or concurrent tortfeasors unless the negligence of the party seeking indemnity was passive and that of the party from whom he sought indemnity was active. *Kansas City Southern Railway Co. v. Payway Feed Mills, Inc.*,

338 S.W.2d 1, 7 (Mo.1960). *Whitehead and Kales* thoroughly discusses the active-passive distinction, 566 S.W.2d at 469–72, and concludes that its use had led to "illogical results" and that its use was "not a sensible way to fix responsibility." *Id.* at 471. The active-passive distinction makes the outcome depend on "ingenuity of phrasing," or "characterization." *Id.* The use of the active-passive distinction has been criticized in cases from other jurisdictions. *Best v. Yerkes,* 247 Iowa 800, 77 N.W.2d 23, 28 (1956); *Tolbert v. Gerber Industries, Inc.,* 255 N.W.2d 362, 367 (Minn.1977); *Kelly v. Long Island Lighting Co.,* 31 N.Y.2d 25, 334 N.Y.S.2d 851, 286 N.E.2d 241, 243 (1972); *Dole v. Dow Chemical Co.,* 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288, 291–93 (1972); *Pachowitz v. Milwaukee & Suburban Transport Corp.,* 56 Wis.2d 383, 202 N.W.2d 268, 271–72 (1972).

(2) Prior to *Whitehead and Kales,* Missouri's contribution statute, § 537.060, RSMo 1978 (§ 3658, RSMo 1939), was interpreted to "allow [ ] contribution between joint tortfeasors only *after* a joint judgment [was rendered] against them," and even if the plaintiff amended his petition to name an impleaded third-party defendant, the plaintiff could still "by release . . . prevent a third-party defendant from becoming subject to contribution." *State ex rel. McClure v. Dinwiddie,* 358 Mo. 15, 22, 213 S.W.2d 127, 131 (Mo. banc 1948). *See also*

*May v. Bradford,* 369 S.W.2d 225, 228 (Mo. 1963); *Crouch v. Tourtelot,* 350 S.W.2d 799, 803 (Mo. banc 1961); *State ex rel. Merino v. Rose,* 362 Mo. 181, 240 S.W.2d 705, 707 (Mo. banc 1951); *Layman v. Uniroyal, Inc.,* 558 S.W.2d 220, 225 (Mo.App.1977). This construction of § 537.060, RSMo 1978, was forcefully rejected in *Whitehead and Kales* in the following terms:

> To limit any apportionment of damages between tortfeasors to those whom the plaintiff has chosen to sue and against whom judgment is rendered is an inartful and capricious policy, relying in excess upon the whim and wrath of a plaintiff before concurrent wrongdoers can share liability.

566 S.W.2d at 473. And again: "there is no sound reason why this issue should not be decided by the jury prior to judgment on the basis of relative fault." *Id.* at 474. Instead, the distribution of joint tort liability on the basis of relative fault "would apply whether the tortfeasors were joined as defendants by the plaintiff or a third party defendant was added to a cause under our rule 52.11." *Id.*

(3) *Whitehead and Kales* did not, however, extend the principle that one should pay only for the damages which he wrongfully caused to abolish the rule of joint and several liability among joint and concurrent tortfeasors.[3] The Court stated that, whether tortfeasors were joined as defendants by

---

3. The rule that joint or concurrent tortfeasors may be sued jointly or severally, and that a plaintiff may recover all of his damages from any or all of multiple tortfeasors whose wrong contributed to cause him harm, has long been the law in this state. *State ex rel. Hall v. Cook,* 400 S.W.2d 39, 40 (Mo. banc 1966) (permitting the jury to assess exemplary damages against multiple tortfeasors in differing amounts according to their degree of culpability); *Electrolytic Chlorine Co. v. Wallace & Tiernan Co.,* 328 Mo. 782, 789, 41 S.W.2d 1049, 1052, 78 A.L.R. 930, 936 (1931); *Neal v. Curtis and Co. Mfg. Co.,* 328 Mo. 389, 418, 41 S.W.2d 543, 556–57 (1931); *Gerber v. Kansas City,* 311 Mo. 49, 277 S.W. 562, 564 (1925); *State ex rel. Blythe v. Trimble,* 302 Mo. 699, 706–710, 258 S.W. 1013, 1015–16 (1924); *Shafir v. Sieben,* 233 S.W. 419, 424, 17 A.L.R. 637 (Mo. banc 1921); *Rogers v. Rogers,* 265 Mo. 200, 209, 177 S.W. 382, 384 (1915); *Applegate v. Quincy, Omaha & Kansas City Railroad Co.,* 252 Mo.

173, 196, 158 S.W. 376, 383 (1913); *Fulwider v. Trenton Gas, Light and Power Co.,* 216 Mo. 582, 116 S.W. 508, 510 (1909); *Berry v. St. Louis, Memphis & Southeastern Railroad Co.,* 214 Mo. 593, 597, 114 S.W. 27, 29 (1908); *Neff v. City of Cameron,* 213 Mo. 350, 358–363, 111 S.W. 1139, 1141–42 (1908); *Bragg v. Metropolitan Street Railway Co.,* 192 Mo. 331, 359, 91 S.W. 527, 535–36 (1905); *Hubbard v. St. Louis & Meramec Railroad Co.,* 173 Mo. 249, 255, 72 S.W. 1073, 1074 (1903); *Newcomb v. New York Central & Hudson River Railroad Co.,* 169 Mo. 409, 422–427, 69 S.W. 348, 352–53 (1902); *Murphy v. Wilson,* 44 Mo. 313, 322 (1869). The rule has even been applied to strike as surplusage and without legal effect that part of a jury verdict that apportioned the plaintiff's damages against joint tortfeasors. *State ex rel. St. Louis Public Service Co. v. Becker,* 334 Mo. 115, 66 S.W.2d 141, 144–45 (1933). Cf. *Crystal Tire Co. v. Home Service Oil Co.,* 465 S.W.2d 531

the plaintiff or joined as third-party defendants under rule 52.11,

> the ability of a plaintiff to sue and ultimately collect judgment against his or her choice of tortfeasor need not be impaired. Plaintiff continues free to sue one or more concurrent tortfeasors as he sees fit and nothing that transpires between them as to their relative responsibility can reduce or take away from plaintiff any part of his judgment.

566 S.W.2d at 474. Or again: "The interests of plaintiffs are secure . . .." *Id.* The Court held that while it is "inartful and capricious" and gives unnecessary effect to the "whim and wrath" of the plaintiff to bar contribution among joint tortfeasors unless a joint judgment has been entered

against them, the plaintiff may "ultimately collect judgment against his or her choice of tortfeasor" regardless of the proportion of damages caused by each tortfeasor.

While it may appear difficult to reconcile a rule that permits a plaintiff to collect his or her entire judgment from one who is only partly at fault with the principle that one is not liable for damages one did not wrongfully cause, closer examination of the rule of joint and several liability discloses the extent to which it is supported by the principle of fairness.[4]

### D. Joint and Several Liability and the Principle of Fairness

The general trend toward the adoption of comparative negligence has led to a trend

(Mo.1971). Of course, *Becker* was overruled *sub silentio* in *Whitehead and Kales.*

Several of the cases cited in *Whitehead and Kales* from other jurisdictions that have adopted a system of relative fault reaffirm the common law rule of joint and several liability of concurrent tortfeasors. *Packard,* 274 A.2d at 180 (describing as a codification of the common law rule the sentence found in 14 Me.Rev.Stat. § 156: "In a case involving multi-party defendants, each defendant shall be jointly and severally liable to the plaintiff for the full amount of damages."); *Kelly,* 31 N.Y.2d at 30, 334 N.Y. S.2d at 855, 286 N.E.2d at 243 ("this refinement of the rule of contribution does not apply to or change the plaintiff's right to recover against any joint tort-feasor in a separate or common action the total amount of his damages suffered and not compensated."); *Chart v. General Motors Corp.,* 80 Wis.2d 91, 258 N.W.2d 680, 687 n. 9 (1977) (reaffirming the retention of joint and several liability in *Bielski, infra* ); *Bielski,* 16 Wis.2d at 6, 114 N.W.2d at 107 ("this refinement of the rule of contribution does not apply to or change the plaintiff's right to recover against any defendant tortfeasor the total amount of his damages to which he is entitled.") These cases do not consider whether the rule of joint and several liability is consistent with a system of comparative fault based on the principle that one is only liable for damage that one has caused, and do not identify the policy which supports retaining the rule of joint and several liability.

4. Recently, several cases in other jurisdictions have considered whether the adoption of relative fault or comparative fault logically leads to the abandonment of joint and several liability. *American Motorcycle Association v. Superior Court of Los Angeles County,* 65 Cal.App.3d 694, 135 Cal.Rptr. 497 (1977), vacated 20 Cal.3d

578, 146 Cal.Rptr. 182, 578 P.2d 899 (1978); *Tucker v. Union Oil Co.,* 100 Idaho 590, 603 P.2d 156 (1979); *Brown v. Keill,* 224 Kan. 195, 580 P.2d 867 (1978); *Geier v. Wikel,* 4 Kan. App.2d 188, 603 P.2d 1028 (1979); *Ohio River Pipeline Corp. v. Landrum,* 580 S.W.2d 713 (Ky.App.1979); *Laubach v. Morgan,* 588 P.2d 1071 (Okl.1978); *Seattle First National Bank v. Shoreline Concrete Co.,* 91 Wash.2d 230, 588 P.2d 1308 (1978). Courts in some jurisdictions have also considered the extent to which a release or settlement with one of multiple tortfeasors should reduce a plaintiff's judgment for damages. *Cartel Capital Corp. v. Fireco of New Jersey,* 81 N.J. 548, 410 A.2d 674 (1980); *Bartels v. City of Williston,* 276 N.W.2d 113 (N.D.1979); *Luxenburg v. Can-Tex Industries,* 257 N.W.2d 804 (Minn.1977); *Bradley v. Appalachian Power Co.,* 256 S.E.2d 879 (W.Va.1979). *Chrysler Corp. v. Todorovich,* 580 P.2d 1123 (Wyo.1978). *See Pierringer v. Hoger,* 21 Wis.2d 182, 124 N.W.2d 106 (1963). Some cases have examined whether a plaintiff's judgment in a relative fault system should be reduced when part of the damages resulted from the negligence of the plaintiff's employer, but the employer is immune from liability under the "release" or "exclusivity" provisions of the workmen's compensation statutes. *Associated Construction & Engineering Co. of California v. Workers' Compensation Appeals Board,* 22 Cal.3d 829, 150 Cal.Rptr. 888, 587 P.2d 684 (1978); *Tucker v. Union Oil Co.,* 100 Idaho 590, 603 P.2d 156 (1979); *Lambertson v. Cincinnati Corp.,* 312 Minn. 114, 257 N.W.2d 679 (1977); *Cordier v. Stetson-Ross, Inc.,* 604 P.2d 86 (Mont.1979); *Arcell v. Ashland Chemical Co.,* 152 N.J.Super. 471, 378 A.2d 53 (1977); *Seattle First National Bank v. Shoreline Concrete Co.,* 91 Wash.2d 230, 588 P.2d 1308 (1978).

toward the adoption of comparative fault on the defendants' side. The reexamination of the rules concerning contributory negligence and contribution among joint tortfeasors has also led to reexamination of the rule of joint and several liability. Four arguments have been presented for retaining the rule of joint and several liability in a comparative fault system. *American Motorcycle Association v. Superior Court of Los Angeles County*, 20 Cal.3d 578, 146 Cal. Rptr. 182, 578 P.2d 899, 904–06 (1978). These arguments may be summarized as follows:

(1) A tortious injury is indivisible, and a joint or concurrent tortfeasor is liable for any indivisible injury of which his negligence is a proximate cause. The fact that fault is apportioned on a comparative negligence basis does not render a tortious injury "divisible" for purposes of the rule of joint and several liability.

(2) The law is loath to permit an innocent plaintiff to suffer loss as against a wrongdoing defendant. A faultless plaintiff should not bear the risk of loss if one of the concurrent tortfeasors is unable to satisfy his proportionate share of the damages.

(3) A plaintiff's culpability is unlike that of a negligent defendant, because the plaintiff's negligence relates to a lack of care for his own safety, while the defendant's negligence relates to a lack of care for the safety of others; the latter is tortious, but the former is not.

(4) Adoption of a rule of proportionate liability would, in practice, impair the ability of negligently injured persons to receive adequate compensation. Fairness dictates that the wrongdoers should be left to work out among themselves any apportionment.

Brief analysis of these arguments discloses the sound policy underlying retention of a limited form of the rule of joint and several liability of joint and concurrent tort-

feasors.[5] The argument that a concurrent tortfeasor is liable for all damages flowing from an indivisible injury of which his negligence is a proximate cause is clearly inconsistent with the principle that liability for damage will be borne by those whose negligence caused it in direct proportion to their respective fault. The attempt in argument (1) above to justify the rule of joint and several liability by formulating a restrictive definition of "divisibility" of tortious injury appears to assume the conclusion it purports to establish. The argument leaves unanswered the central question whether liability should be assessed in accordance with the proportion of damage for which a defendant is at fault or in accordance with the character of the injury. No reason appears for characterizing tortious injuries as "indivisible" except to rationalize continuing the rule of joint and several liability. Placing reliance on characterization of the injury as "divisible" or "indivisible" to determine the distribution of liability is as arbitrary as was the use of the labels "active" and "passive" or "primary" and "secondary" prior to *Whitehead and Kales*. The terms "indivisible injury" and "relative fault" would appear to be mutually exclusive. Argument (3) is also subject to criticism: it is not made clear why the fact that the self-directed negligence of a plaintiff is nonactionable should justify permitting the plaintiff to execute for 100% of his or her judgment against a defendant who was causally responsible for only a portion of the damages. Reliance on these two arguments represents a form of judicial inertia; in fact, decisions that recite these arguments also rely on the claim that no state has abolished the rule of joint and several liability unless a statute specifically abolishes it. *Seattle First National Bank v. Shoreline Concrete Co.*, 91 Wash.2d 230, 588 P.2d 1308, 1313 (1978); *American Motorcycle Association v. Superior Court of Los Angeles County*, 20 Cal.3d 578, 146 Cal. Rptr. 182, 578 P.2d 899, 906 (1978).[6] That

---

5. For discussion of the distinction between joint and concurrent tortfeasors, ·and of the related concept of successive tortfeasors, see *Seattle First National Bank v. Shoreline Con-*

*crete Co.*, 91 Wash.2d 230, 588 P.2d 1308, 1312 (1978).

6. These cases quote the claim from V.

claim is no longer true. *Laubach v. Morgan*, 588 P.2d 1071, 1074 (Okl.1978).

Even if the rule were universally retained, however, the principle of fairness propounded in *Whitehead and Kales* requires its reexamination. *Whitehead and Kales* presents a paradigm case of reasoned departure from the rule of stare decisis. The fact that a rule has long been followed does not require that we continue to follow it, if the reason for the rule has ceased to operate. As Mr. Justice Holmes pointed out:

> It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.

O. Holmes, Collected Legal Papers 187 (1920); Holmes, The Path of the Law, 10 Harv.L.Rev. 457, 469 (1897). In the words of Mr. Justice Douglas, a judge cannot avoid reexamining precedents "unless he lets men long dead and unaware of the problems of the age in which he lives do his thinking for him." Douglas, Stare Decisis, 49 Colum.L.Rev. 735, 736 (1949).

At least some of the reasons originally offered for the rule of joint and several liability in Missouri have "vanished long since." In *Newcomb v. New York Central and Hudson River Railroad Co.*, 169 Mo. 409, 426, 69 S.W. 348, 353 (1902), the Court quoted Bishop, Noncontract Law § 518, for "the reason underlying the rule" of joint and several liability:

> [S]ince the habitations and life of man are in the midst of constantly active forces in nature, and his necessities compel him to be perpetually active also, it is not possible in jurisprudence, nor would it be just to limit one's responsibility for harm inflicted on another through his acts, to the particular injuries whereof those acts are the sole cause. Indeed, a sole cause is a thing seldom found in our complicated world. *Nor would it be practicable, nor yet is it demanded by any principle of justice, to take into the account all the combining causes of an injury, and charge the author of each cause with simply his proportion of the damage.* Therefore the rule of the law is, that a person contributing to a tort, whether his fellow-contributors are men, natural, or other forces, or things, is responsible for the whole, the same as though he had done all without help. The limit to this rule, in civil jurisprudence is simply what is required by another rule, namely, that [a person who has suffered an injury is entitled to receive his damages but once] . . . . .

J. Bishop, Noncontract Law § 518, p. 229 (1889); 169 Mo. at 426, 69 S.W. at 353.

Schwartz, Comparative Negligence § 16.4, p. 253 (1974): "The concept of joint and several liability of tortfeasors has been retained under comparative negligence, unless the statute specifically abolishes it, in all states that have been called upon to decide the question." The statement is now false. The Oklahoma Supreme Court recently decided to "[d]o away with the 'entire liability rule' and provide that multiple tortfeasors are severally liable only, thus each defendant will be liable only for the percentage of the award attributable to him." *Laubach v. Morgan*, 588 P.2d 1071, 1074 (1978). This decision was not specifically required by statute. Several states have by statute abolished the rule of joint and several liability of concurrent tortfeasors. *Brown v. Keill*, 224 Kan. 195, 580 P.2d 867, 873–74 (1978), Kan.Stat.Ann. § 60–258a(d) (1976), N.H.Rev.Stat.Ann. § 507:7–a (Supp.1979); Vt.Stat.Ann. tit. 12 § 1036 (1973). Nevada, Oregon, and Texas have limited the rule of joint and several liability by statute in cases where the defendant's percentage of fault is less than the plaintiff's. Nev.Rev.Stat. § 41.141.3 (1979) (provides for joint and several liability "except that a defendant whose negligence is less than that of the plaintiff is not jointly liable and is severally liable to the plaintiff only for that portion of the judgment which represents the percentage of negligence attributable to him"); Or.Rev.Stat. § 18.485 (1977) (provides for joint and several liability "except that a defendant whose percentage of fault is less than that allocated to the plaintiff is liable to the plaintiff only for that percentage of the recoverable damages"); Tex.Rev.Civ.Stat.Ann. art. § 2212a, § 2(c) (Vernon Supp.1979) (provides for joint and several liability "except that a defendant whose negligence is less than that of the claimant is liable to the claimant only for that portion of the judgment which represents the percentage of negligence attributable to him").

(Emphasis added.) The rule of joint and several liability can no longer be justified by the impracticability of assessing proportionate fault among multiple tortfeasors. This reason for the rule was completely eradicated by *Whitehead and Kales*, in which the Court stated that instructing a jury to apportion the respective fault of concurrent tortfeasors

> would present no insurmountable problem to the jury. We already differentiate verdicts among joint tortfeasors where punitive damages are involved. The jury is instructed that they may find punitive damages against several defendants in differing amounts, depending upon differing degrees of culpability, *State ex rel. Hall v. Cook*, 400 S.W.2d 39, 42 (Mo. banc 1966); MAI 10.03; MAI 36.12. A system of apportionment of damages has long been in use in Missouri in Federal Employer's Liability Act cases, where the assessment of the extent of plaintiff's relative fault (contributory negligence) is handled by a simple instruction that if the plaintiff is found to be contributorily negligent, then the jury "*must diminish the sum in proportion to the amount of negligence attributable to [plaintiff] [decedent].*" MAI 32.07, Notes on Use (2d ed. 1969).

566 S.W.2d at 472. More importantly, the holding of *Whitehead and Kales* shows how far we have moved from the view expressed in *Newcomb* that no principle of justice demands that we take into account all the combining negligent causes of an injury and "charge the author of each cause with simply his proportion of the damage." The principle of fairness articulated in *Whitehead and Kales* demands precisely the kind of apportionment that *Newcomb* rejected.

The only remaining rationale for retaining a rule of joint and several liability is the practical consideration that in certain cases the plaintiff is completely innocent and one or more of concurrent tortfeasors is unable to pay his or her proportionate share of the damages. In such a case, the plaintiff should be permitted to receive complete compensation from any one of the tortfeasors, leaving that wrongdoer to seek indemnity or contribution from the other concurrent tortfeasors. See arguments (2) and (4) above. Where one of several concurrent tortfeasors is insolvent, complete abolition of the rule of joint and several liability would result in an innocent plaintiff bearing the burden of a loss that he or she in no way caused, which would violate our principle of fairness. Placing the risk of a tortfeasor's insolvency on other tortfeasors through a limited rule of joint and several liability may be seen as applying the principle of fairness to innocent plaintiffs: the plaintiff should not be forced to bear the burden of losses which others have caused him and which did not result from his own negligence.[7] These considerations, however, do not justify retention of a blanket rule that a plaintiff may always execute for 100% of his or her judgment against one

---

7. It has been persuasively argued that the rule of joint and several liability should never be applied where the recovering plaintiff was himself negligent. *American Motorcycle Association v. Superior Court of Los Angeles County*, 20 Cal.3d 578, 612, 146 Cal.Rptr. 182, 204, 578 P.2d 899, 921 (1978) (Clark, J., dissenting). At least for the present time, Missouri's law completely exonerates from the payment of damages those tortfeasors who cause injury to a negligent plaintiff. *Steinman v. Strobel*, 589 S.W.2d 293 (Mo. banc 1979). So long as Missouri continues to recognize the doctrine of contributory negligence, of course, we need not confront the question whether concurrent tortfeasors will be jointly and severally liable to a negligent plaintiff. Examination of the extent to which the doctrine of contributory negligence is inconsistent with the principle of fair-

ness, that one is not liable for damage which one did not negligently cause, must be left for another day. *See Sorrentino v. United States*, 344 F.Supp. 1308, 1310 (E.D.N.Y.1972); *Berenger v. Gottlieb*, 72 Misc.2d 349, 338 N.Y.S.2d 319, 324 (1972); *rev'd*, 77 Misc.2d 960, 357 N.Y.S.2d 583 (1973).

Concerning the relation of the policy favoring compensation of the innocent plaintiff to the rule of joint and several liability, see Adams, Settlements after Li: But is it "Fair"? 10 Pac. L.J. 729, 740 n.73 (1979); Surlas, Contribution Act Construed—Should Joint and Several Liability Have Been Considered First? 30 U.Miami L.Rev. 747, 754 (1976); Boyette, Reconciling Comparative Negligence, Contribution, and Joint and Several Liability, 34 Wash. & Lee L.Rev. 1159, 1170 (1977).

who is less than 100% at fault. The rule of joint and several liability should be retained only to the extent necessary to ensure that a faultless plaintiff does not bear a loss which he or she did not negligently cause. Only to that extent is the rule of joint and several liability compatible with our system of relative fault. Accordingly, no plaintiff should be able to recover from one of multiple tortfeasors more than that tortfeasor's proportion of fault, absent a showing that the plaintiff is unable to satisfy his or her judgment against another of the concurrent tortfeasors.

### E. *Maryland Heights* and the Principle of Fairness

I believe that our decision in *Maryland Heights* failed to appreciate the full implications of the fundamental principle articulated in *Whitehead and Kales*, that one is not liable for damage which he did not negligently cause. The effect of *Maryland Heights* was to require the non-employer defendant to bear 100% of the employee's loss, regardless of the non-employee defendant's proportion of fault.

The Court in *Maryland Heights* relied on *Seaboard Coast Line Railroad Co. v. Smith*, 359 So.2d 427, 429–30 (Fla.1978) for its view of the effect of the statutory immunity of the employer under the workmen's compensation provisions. It is not clear that the Florida court's treatment of the question should be persuasive in Missouri after *Whitehead and Kales*. *Whitehead and Kales* created a system of relative fault that applies regardless of whether the issue is presented by a claim for contribution or by a claim for indemnity. Florida, however, rejects indemnity between joint tortfeasors and rejects weighing the relative fault of tortfeasors on a claim for indemnity. *Houdaille Industries, Inc. v. Edwards*, 374 So.2d 490 (Fla.1979).[8] The question whether the employer's fault should be determined in order to fix the non-employer de-

fendant's measure of liability must be answered in the light of the principles laid down in *Whitehead and Kales*.

The court in *Seaboard* pointed out that the employer's liability to pay workmen's compensation benefits "replaces tort liability" of the employer and "substitutes for the employer's common law liability for damages." *See Maryland Heights*, 588 S.W.2d at 491, quoting *Seaboard*, 359 So.2d at 429–30. It is precisely because workmen's compensation benefits substitute for the employer's common law liability that the employee should not be permitted to recover 100% of his damages from the non-employer whose negligence concurred with that of the employer to cause the employee's injury. Such a result clearly violates the principle that one tortfeasor is ultimately liable only for the amount of damages that he caused. The employer, through the payment of workmen's compensation benefits, has borne his proportionate share of liability for the employee's injury. That proportion should not be paid to the employee a second time by the non-employer tortfeasor.

The policy against multiple recovery by injured employees eligible for workmen's compensation benefits is set by statute. § 287.150, RSMo 1978. Certainly that policy could be given effect and the system rendered more efficient, if the non-employer defendant is held liable only for the share of the damages that he caused to the employee.

In keeping with the "principle of fairness," I would hold that the employer is a person in whose absence "complete relief cannot be accorded among those already parties," and hence the employer should be joined in the action under our Rule 52.04(a), (b). See *Maryland Heights*, 588 S.W.2d 489, 492 (Mo. banc 1979) (Donnelly, J., dissenting). The proportion of the employee-plaintiff's injury that was caused by the employer's negligence should be determined by the

---

**8.** Florida does permit pro rata apportionment among joint tortfeasors on a claim for contribution. *Lincenberg v. Issen*, 318 So.2d 386 (Fla. 1975). In *Seaboard*, the court stated that "indemnity is bottomed on entirely different con-

siderations from contribution," 359 So.2d at 429, and affirmed the dismissal of a third-party claim against the employer for either indemnity or contribution. 359 So.2d at 430.

jury, so that the judgment entered against the non-employer defendant will reflect only that portion of damages for which the non-employer defendant was responsible. Consequently, I believe the trial court's order granting respondent Chemlime's motion for judgment on the pleadings was in error, and that it should be reversed and the case remanded for further proceedings consistent with the rule requiring apportionment of liability in direct relation to the degree of fault.

### F. The Effect of Settlements in a System of Relative Fault

Our decision in *Whitehead and Kales* left unanswered numerous questions concerning the effect of a settlement agreement with one concurrent tortfeasor on the liability of other settling and nonsettling tortfeasors. Can the settling tortfeasor be held liable for contribution or indemnity to the nonsettling tortfeasor if the amount of the settlement is less than the settling tortfeasor's proportionate share of the obligation? Or does the settlement contract discharge the settling tortfeasor from all further liability to the plaintiff and from the obligation to contribute to or indemnify the remaining tortfeasors? Does settlement reduce the plaintiff's ultimate judgment for damages against the remaining tortfeasors by the amount paid in settlement or by the amount of the settling tortfeasor's portion of fault? Without answers to these questions, neither plaintiffs nor defendants are able to compromise lawsuits with any confidence as to the legal effect of such agreements. The principles discussed above may be used to generate answers to these questions that are both simple and fair.

The purposes of both plaintiffs and defendants in compromising lawsuits are similar. A plaintiff seeks certainty of recovery free from the expense and trauma of litigation; a defendant seeks to avoid the costs of litigation and to avoid the risk that trial might result in a judgment for damages in excess of the amount the plaintiff is willing to accept in settlement. Our rules concerning the effect of a settlement should be tailored to encourage settlements without sacrificing the overall purpose of fairly resolving disputes. "The law favors compromise and settlement of disputed claims. 'It is to the interest of the commonwealth that there should be an end to litigation.'" *Mateer v. Missouri Pacific Railway Co.*, 105 Mo. 320, 354, 16 S.W. 839, 848 (banc 1891). *Accord, Vondera v. Chapman*, 352 Mo. 1034, 1038, 1039, 180 S.W.2d 704, 705–06 (1944).

In order for a settlement to achieve the purpose of resolving disputes, and the parties' purposes of avoiding litigation, we must hold that a tortfeasor who has entered into a good faith settlement is discharged from any claim for indemnity or contribution that may be pressed by a joint or concurrent tortfeasor. *See American Motorcycle Association v. Superior Court of Los Angeles County*, 20 Cal.3d 578, 604, 146 Cal.Rptr. 182, 198, 578 P.2d 899, 915 (1978). Any other rule would remove incentive for one of multiple tortfeasor defendants to settle the case: settlement would not free them from further litigation expenses or from uncertainty of liability. " 'Few things would be better calculated . . . to discourage settlement of disputed tort claims, than knowledge that such a settlement lacked finality and would lead to further litigation with one's joint tortfeasors, and perhaps further liability.'" *Id.* "[A] settlement is made and a general release taken for the purpose of foreclosing further claims." *Sanger v. Yellow Cab Co.*, 486 S.W.2d 477, 481 (Mo. banc 1972).

A settlement, release, or covenant not to sue, agreed upon between the plaintiff and one tortfeasor in a multiparty case, should be interpreted to satisfy that portion of the plaintiff's damages that corresponds to the settling tortfeasor's proportionate fault. This rule has been adopted in other jurisdictions that have adopted a system of comparative fault among joint and concurrent tortfeasors. *Cartel Capital Corp. v. Fireco of New Jersey*, 81 N.J. 548, 410 A.2d 674, 685 (1980); *Bartels v. City of Williston*, 276 N.W.2d 113, 122 (N.D.1979); *Geier v. Wikel*, 4 Kan.App.2d 188, 189, 603 P.2d 1028, 1030 (1979). *Cf. Frey v. Snelgrove*, 269 N.W.2d 918, 921 (Minn.1978); *Pierringer v. Hoger*,

21 Wis.2d 182, 124 N.W.2d 106, 111–12 (1963). This rule also comports with Section 6 of the Uniform Comparative Fault Act. 12 U.L.A. 42 (Supp.1979).

Courts in other states that have adopted a system of comparative fault among joint and concurrent tortfeasors have held that comparative fault does not alter the rule that a settlement with one tortfeasor effects a *pro tanto* or dollar-for-dollar reduction in the plaintiff's judgment against remaining tortfeasors. *See, e. g., American Motorcycle Association v. Superior Court of Los Angeles County,* 20 Cal.3d 578, 604, 146 Cal.Rptr. 182, 199, 578 P.2d 899, 916 (1978); *Bradley v. Appalachian Power Co.,* 256 S.E.2d 879, 887 (W.Va.1979). Although the rule of *pro tanto* reduction would encourage a plaintiff to settle at a discount with some defendants, it would require the plaintiff to retain his or her claim against at least one defendant in order to recover a full measure of his or her damages, diminished only by the amount of the settlements. Plaintiffs under this rule are often not willing to settle with the one tortfeasor whose negligence is proved most easily and against whom a judgment could be collected most easily. Thus, the rule virtually requires that there be at least one lawsuit. Moreover, the ultimate distribution of liability clearly violates the equitable principles underlying adoption of relative fault. In a system in which the plaintiff's damage judgment against nonsettling tortfeasors is reduced only by the amount of payments received from settling tortfeasors, the liability of the remaining defendants would be determined without considering the relative fault of the settling tortfeasor. Such a system permits a disproportionate burden to be placed on nonsettling tortfeasors.

For example, suppose that plaintiff *A* suffers $100,000 in damage resulting from the concurring negligence of defendants *B,* *C* and *D.* Suppose further that *B*'s proportion of fault is 10%, *C*'s proportion of fault is 30%, and *D*'s proportion of fault is 60%. Under our system of relative fault, trial would result in *B* paying $10,000, *C* $30,000, and *D* $60,000. Suppose *A* settled with *B* for $1,000.[9] Suppose that *C* agrees to pay *A* $25,000 in exchange for a release from liability. *A* would be permitted to recover the remaining $74,000 from *D* despite the fact that *D* was only responsible for $60,000 of *A*'s loss. *A* will have little incentive to settle his or her claim against *D.* The rule that settlements work a dollar-for-dollar reduction in plaintiff's damage judgment against nonsettling tortfeasors thus makes the process of compromising claims into a form of musical chairs in which the last tortfeasor to agree to a settlement often will not be able to settle the case, and will be required to pay more than his proportionate share of the loss. Such a rule of settlements would establish a system of apportioning damages among concurrent tortfeasors that is "inartful and capricious" and which "rel[ies] in excess upon the whim and wrath of a plaintiff," something this Court justly condemned in *Whitehead and Kales.* 566 S.W.2d at 473. The rules governing settlements should be structured in order to give effect to the principle of fairness, that the ultimate liability for tortious injury falls on the person who negligently caused the damage. Our settlement rules certainly should not encourage disproportionate distributions of the burden and discourage complete settlements.

A system in which a settlement effects a dollar-for-dollar reduction in the plaintiff's recovery against remaining tortfeasors would deprive a plaintiff of a favorable settlement agreement in cases in which he or she settles with one tortfeasor for more than that tortfeasor's proportionate share

**9.** The fact of settlement increases the pressure on *C* and *D* to settle, if the liability of the remaining defendants is determined without considering the relative fault of the settling tortfeasor. While the amount of damages for which *A* can recover a judgment against *C* and *D* has been reduced to $99,000, the percentage of fault as between *C* and *D* has been increased. Thus, *C* will be found to have caused 33⅓% of *A*'s damages and *D* 66⅔%. Consequently, *C* would be held liable for $33,000, instead of the $30,000 *C* would fairly have been required to pay if *B*'s fault were considered and *D* would be held liable for $66,000, instead of the $60,000 he would fairly have been required to pay if *B* had remained in the case.

of fault. In such a case, the nonsettling tortfeasor would enjoy the benefit of the plaintiff's bargain. For example, suppose again that *A* suffers $100,000 in damage resulting from the concurring negligence of defendants *B, C* and *D*. Suppose again that *B*'s proportion of the fault is 10%, *C*'s is 30%, and *D*'s is 60%. Suppose further that *A* settles with *B* for $10,000 and settles with *C* for $40,000. In a system which reduces the plaintiff's award of damages by the amount received from settling tortfeasors, *D* will be held liable for only $50,000 of *A*'s loss, despite the fact that *D* is responsible for $60,000 of the loss. *D* would receive the entire benefit of *A*'s bargain with *C*. This result is not required by any policy against permitting plaintiffs multiple recovery. The $10,000 "premium" paid by *C* is supported by ample consideration. *C* was spared the burden of litigation expenses defending against *A*'s claim, and was spared months of uncertainty pending resolution of the suit. No principle of equity requires that *D* be awarded the benefit of *A*'s bargain; the principles against unjust enrichment require that *A* retain that benefit.

A settlement contract must operate to satisfy that portion of a plaintiff's loss that corresponds to the percentage of fault of the settling tortfeasor. Such a rule would provide incentive for the plaintiff to settle with all parties, and not require a plaintiff to retain one tortfeasor as a scapegoat. Such a rule would permit the last tortfeasor in the case to negotiate for a settlement on the same footing as the first tortfeasor to settle. Such a rule would not impose on the nonsettling tortfeasors any of the settling tortfeasors' share of the obligation. And such a rule would not let the plaintiff's advantageous settlement agreement with one tortfeasor become a windfall to the remaining tortfeasors.

For the same reasons set out above in connection with the workmen's compensation employer, a tortfeasor who has settled is a person in whose absence "complete relief cannot be accorded among those already parties." Rule 52.04(a), (b). The relative fault of the settling tortfeasor should be determined so that the judgment entered against the remaining tortfeasors reflects only their proportionate fault.

In summary, settlements within a relative fault system of tort liability should be governed by the following rules: (1) a settlement agreement between one tortfeasor and the plaintiff bars any claim for indemnity or contribution brought by a concurrent tortfeasor against the settling tortfeasor; (2) a settlement agreement between one tortfeasor and the plaintiff satisfies that portion of the obligation that corresponds to the settling tortfeasor's proportionate fault; and (3) the settling tortfeasor remains a party to the plaintiff's lawsuit against nonsettling tortfeasors.

These rules will carry through our tort law a systematic application of the doctrine of relative fault. Under these rules, if the plaintiff settles with one tortfeasor for less than that tortfeasor's proportionate fault, the difference usually will be attributable to the value of quick and certain recovery. Any difference not so explained may be the result of a bad bargain; but "the general rule of freedom of contract includes the freedom to make a bad bargain." *Sanger v. Yellow Cab Co.*, 486 S.W.2d 477, 482 (Mo. banc 1972). *See Vondera v. Chapman*, 352 Mo. 1034, 1039, 180 S.W.2d 704, 705–06 (1944). If the plaintiff settles with one tortfeasor for more than that tortfeasor's proportionate fault, the plaintiff alone is entitled to the benefit of his or her bargain. The fact that one tortfeasor has agreed to compromise the claim will neither reduce nor increase the amount of liability of the remaining tortfeasors—each will be liable for the plaintiff's damages in direct proportion to his or her degree of fault.[10]

---

**10.** In *Geier v. Wikel*, 4 Kan.App.2d 188, 190, 603 P.2d 1028, 1030 (1979), the court considered the effect of the plaintiff's settlement with one potential defendant, a railway company, on the liability of remaining tortfeasors. The court stated:

The fact that St. Louis-San Francisco Railway Company was not a named defendant is irrelevant. The defendant is entitled to have

The above rules are easily applied in the case at bar. Appellant's briefs indicate that, after the trial court's order sustaining respondent's motion for judgment on the pleadings was made final on January 13, 1978, appellant settled the case with Parks. Respondent's briefs reject appellant's statement of facts as going outside the record and including matters impertinent to the order sustaining respondent's motion for judgment. The transcript filed in this Court does not contain any evidence that the case was disposed of by a settlement agreement. In the absence of a stipulation by the parties, the transcript may not be supplemented by extraneous matter in the briefs of one party, and such extraneous matter may not be considered on appeal. *Consumer Contact Co. v. Department of Revenue*, 592 S.W.2d 782, 785 n. 1 (Mo. banc 1980); *Pretti v. Herre*, 403 S.W.2d 568, 569 (Mo.1966). On remand, if the trial court determines that a release has been given to appellant, I would direct the court to treat Union Carbide's proportionate liability to Parks in a manner consistent with this opinion.

## II. *McDONNELL AIRCRAFT*, "CONTRACTUAL INDEMNITY" AND RELATIVE FAULT

The Court of Appeals, Eastern District, transferred this case because it was "not certain as to the interpretation of [*McDonnell Aircraft Corp. v. Hartman-Hanks-*

Walsh Painting Co., 323 S.W.2d 788 (Mo. 1959)] in light of [*Whitehead and Kales*]." *Whitehead and Kales* criticized *McDonnell Aircraft* as a case in which the discredited "active-passive" approach had produced an award of full indemnity despite the fact "that the conduct of the indemnitee in these cases was also careless and blameworthy." 566 S.W.2d at 472. Thus, *Whitehead and Kales* recognized that the claim for indemnity involved in *McDonnell Aircraft* was essentially a claim based on the alleged negligence of the indemnitor. Nevertheless, the principal opinion would exclude appellant's claim for indemnity from the requirement that the fault of those who caused the plaintiff's injury should be determined and apportioned. The principal opinion would hold that *McDonnell Aircraft* is still good law after the adoption of relative fault, noting that *Whitehead and Kales* expressly excluded from its holding "indemnity which comes about by reason of contracts." 566 S.W.2d at 468 n. 2. The reservation of an issue not presented to the Court in *Whitehead and Kales* should not be interpreted as an implied holding on that issue when the Court is called upon to decide it. The general principles on which *Whitehead and Kales* relied require the apportionment of fault in a case involving a claim of "contractual" indemnity patterned after *McDonnell Aircraft.*

In *McDonnell Aircraft*, Arbuckle was injured while working as a painter for Hart-

the railroad's percentage of fault determined and has no responsibility to pay the railroad's share of the obligation. . . . The injured party is entitled to keep the advantage of his or her bargaining, just as he or she must live with an inadequate settlement should the jury determine larger damages or a larger proportion of fault than the injured party anticipated when the settlement was reached. It follows that the type of release given will have no effect on any party not specifically named in the instrument.

In *Cartel Capital Corp. v. Fireco of New Jersey*, 81 N.J. 548, 410 A.2d 674, 685 (1980), the Court adopted this rule stating:

Now the effect on the plaintiff of a joint tortfeasor's settlement will depend upon the percentage of fault found against him. When one defendant settles, the remaining codefendant or codefendants are chargeable with

the total verdict less that attributable to the settling defendant's percentage share.

Texas statutes provide for a reduction in the plaintiff's award of damages by that portion which is attributable to a joint tortfeasor who has reached a settlement agreement with the plaintiff but who was joined as a defendant:

If an alleged joint tort-feasor makes a settlement with a claimant but nevertheless is joined as a party defendant at the time of the submission of the case to the jury (so that the existence and amount of his negligence are submitted to the jury) and his percentage of negligence is found by the jury, the settlement is a complete release of the portion of the judgment attributable to the percentage of negligence found on the part of that joint tort-feasor.

Tex.Rev.Civ.Stat.Ann. art. 2212a, § 2(e) (Vernon Supp.1979).

man on McDonnell's premises. Arbuckle obtained a judgment against McDonnell, and McDonnell sought indemnity from Arbuckle's employer, Hartman. The Court noted that McDonnell owed Arbuckle a nondelegable duty to warn of unsafe conditions. Nevertheless, it held that McDonnell had stated a claim for indemnity by alleging that "Hartman had agreed to assume and perform this duty and negligently failed to do so." 323 S.W.2d at 794. The Court discussed at length whether there was a right of indemnity against one who agreed to assume the indemnitee's "non-delegable" duty to warn the plaintiff of hazards on the indemnitee's premises. The Court held that there was such a right of indemnity, relying on Restatement of Restitution § 95, which provides that

> Where a person has become liable with another for harm caused to a third person because of his negligent failure to make safe a dangerous condition of land or chattels . . . which, as between the two, it was the other's duty to make safe, he is entitled to restitution.

323 S.W.2d at 794. Surely a claim for indemnity based on an allegation of negligent failure to warn requires apportionment of liability in accordance with the degree of fault of those whose conduct concurred to cause harm. There is nothing in the argument in *McDonnell Aircraft* for characterizing Hartman's duty as a contractual obligation that warrants abandoning the doctrine of relative fault in such a case. Such a limitation of the doctrine of relative fault would place the entire burden of the plaintiff's loss, in an all-or-nothing fashion, on the indemnitor, even though "the indemnitee . . . was also careless and blameworthy." Such a result clearly violates the principle that one is not liable for damage one did not wrongfully cause.

*McDonnell Aircraft* strained to characterize McDonnell's indemnity claim as contractual, apparently in order to avoid the bar of the workmen's compensation statute. Section 287.120.1, RSMo, provides that the employer subject to the workmen's compensation act "shall be released from all other liability [for personal injury or death of the employee by accident arising out of and in the course of his employment] whatsoever, *whether to the employee or any other person.*" (Emphasis added.) Despite this provision, *McDonnell Aircraft* held that an employer subject to the workmen's compensation act could be required to indemnify a third party, where the third party was held liable for negligently injuring the employee. *McDonnell Aircraft* reasoned that the employer's liability to indemnify the third party for failure to warn was not a liability "for personal injury or death of the employee" within the meaning of the release provision in § 287.120.1, RSMo. Instead, the Court held that such liability to indemnify the third party was liability "for breach of an independent duty or obligation owed to a third party by an employer." The Court stated:

> [T]he Act does not prevent holding Hartman liable to indemnify McDonnell for loss caused McDonnell by the breach of its duty to McDonnell, which arose by reason of Hartman's express agreement to assume and perform it. Such a ruling does not hold the employer liable for the personal injury or death of his employee but instead holds him liable for the breach of an independent duty to a third party which he expressly agreed to perform.

*Id.* at 796. The Court stated that the workmen's compensation act was not "intended to affect the rights of third parties outside the employer-employee relationship." *Id.* I believe that the unmistakable language of § 287.120.1, RSMo 1978, releasing the employer from "all other liability . . . whatsoever, whether to the employee or *any other person,*" is easily broad enough to release the employer from liability for breach of a duty owed a third party. Moreover, the employer's liability for such breach is directly tied to his employee's injury: no claim of indemnity would arise unless the employee was injured as a proximate result of the employer's breach of a duty to warn and the employee held the third party liable in damages for the employee's injuries. Thus, holding the em-

ployer liable in such a case is holding him liable *both* for the breach of duty owed to a third party *and* (indirectly) "on account of" the personal injury or death of his employee. It is only through the use of an abbreviated description of the origin of the employer's liability that *McDonnell Aircraft* made such liability appear to be outside the scope of § 287.120.1, RSMo 1978.

*McDonnell Aircraft* relied heavily on the construction given the "exclusivity" provision of the Longshoremen's and Harbor Workers' Compensation Act by the United States Supreme Court in *Ryan Stevedoring Co. v. Pan-Atlantic Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). I believe that the provision construed in *Ryan* is significantly different from § 287.120.1, RSMo 1978, and that *McDonnell Aircraft*'s resolution of the question resulted from a failure to give careful attention to the unique wording of our statute. I would overrule *McDonnell Aircraft* to the extent that it conflicts with the views herein expressed.

In accordance with the views expressed in the previous section, the fact that § 287.120.1, RSMo 1978, immunizes the employer from liability for indemnity, contractual or non-contractual, for damages paid to an injured employee does not imply that the allegedly negligent employer should not remain a party to the lawsuit. His relative fault must be determined in order accurately to determine the relative fault of the non-employer defendant. Accordingly, I would reverse and remand the case for such further proceedings as are necessary to ensure that appellant's liability is directly proportionate to its degree of fault.

DONNELLY, Judge, dissenting.

In *Anderson v. Cahill,* 528 S.W.2d 742, 749 (Mo. banc 1975), Judge Seiler joined me in expressing the view that this Court should consider adopting a "pure" form of comparative fault.

In *Missouri Pacific Railroad Co. v. Whitehead and Kales Co.,* 566 S.W.2d 466 (Mo. banc 1978), this Court embraced a concept of "relative fault." In *State ex rel. Maryland Heights Concrete Contractors, Inc. v.*

*Ferris,* 588 S.W.2d 489 (Mo. banc 1979), this Court neutered the *Whitehead and Kales* holding. As a result, the Bench and Bar of Missouri were left in a state of hopeless confusion.

In *Steinman v. Strobel,* 589 S.W.2d 293, 295 (Mo. banc 1979), my perception of *pure* comparative fault was considered and rejected by a majority of this Court.

The dissenting opinion filed in this case by Judge Welliver articulates beautifully the rationale for my dissenting opinion in *Steinman, supra.* However, *pure* comparative fault has again been rejected.

I have been given ample opportunity to persuade and have failed. I have no right, in these circumstances, to continue to array my judgment against that of the majority of my brethren on this Court. And, of course, the confusion resulting from the stillbirth in 1978 continues unabated.

Accordingly, I must conclude, *with regret,* "that we should overrule *Whitehead and Kales* and return the law of torts in Missouri to whatever degree of stability existed for the one hundred and fifty years prior that decision." *Steinman, supra,* 589 S.W.2d 293, 295 (Welliver, J., concurring).

I respectfully dissent.